UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                           Chapter 7

Harvey Goldman & Company,                        Case No. 10-62501

      Debtor.                              Hon. Phillip J. Shefferly
_____/

Stuart A. Gold, Trustee of the Chapter 7         Adversary Proceeding No. 11-04829-PJS
Bankruptcy Estate of Harvey Goldman &
Company,

      Plaintiff,

v.

Yitzchok Rubin,

      Defendant.
_____/


**OPINION GRANTING IN PART DEFENDANT'S MOTION TO DISMISS FOR
PLAINTIFF'S FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**


**Introduction**

This opinion deals with one issue: is the defendant in this adversary proceeding an

"insider" of the debtor corporation?  The complaint alleges that the defendant is an insider

because he is the second cousin of the debtor's president.  For the reasons set forth in this

opinion, the Court holds that the defendant's status as a second cousin of the debtor's

president does not, by itself, make him an insider of the debtor.

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

## Facts

David Simcha ("Simcha") was the president of a corporation known as Harvey Goldman & Company ("Debtor"). On July 14, 2010, an involuntary Chapter 7 petition was filed against the Debtor. An order for relief was subsequently entered. On February 21, 2011, the interim Chapter 7 Trustee filed this adversary proceeding. The permanent Chapter 7 Trustee ("Trustee") later substituted in as the plaintiff. The adversary proceeding seeks to recover certain payments alleged to have been made by the Debtor to the Defendant, Yitzchok Rubin ("Rubin"). The complaint alleges that one of the payments, in the amount of $22,000.00, was made more than 90 days but within one year before the bankruptcy petition was filed. The complaint alleges that even though this payment was made more than 90 days before the bankruptcy petition was filed, this payment is still recoverable as a preferential transfer under § 547(b) of the Bankruptcy Code, because Rubin is an "insider" of the Debtor. The complaint alleges that Rubin is an insider of the Debtor because he is Simcha's second cousin and, therefore, is a "relative" of Simcha, the Debtor's president. The complaint alleges that because Rubin is an insider of the Debtor, the look back period under § 547(b)(4)(B) to recover this payment as a preferential transfer is one year before the date that the bankruptcy petition was filed.

On May 31, 2011, Rubin filed a motion to dismiss this adversary proceeding. The motion asserts that the only allegation in the complaint that could possibly make Rubin an insider of the Debtor is the allegation that Rubin is Simcha's second cousin. Rubin argues that even accepting this allegation as true, this fact, by itself, is insufficient to make him an insider of the Debtor. Specifically, Rubin argues that a second cousin is not a relative, as that term is defined in § 101(45) of the Bankruptcy Code. Because he is not Simcha's relative, Rubin argues that he is not an insider of the Debtor, as that term is defined in § 101(31) of the Bankruptcy Code. Because he is not an insider of the Debtor, Rubin argues that the look back period to recover any preferential transfers made to him by the Debtor is 90 days. Therefore, Rubin moves to dismiss the Trustee's complaint to the extent that it seeks to recover any payments made more than 90 days before the bankruptcy petition was filed.

On July 1, 2011, the Court heard the motion to dismiss. The Court ruled at that time on a number of issues raised by the motion to dismiss, which are not germane to this opinion. However, the Court took under advisement the motion's request to dismiss the complaint with respect to the $22,000.00 payment based on Rubin's assertion that he is not an insider of the Debtor. This opinion addresses that issue.

## Discussion

Section 101(45) of the Bankruptcy Code defines the term "relative" as meaning an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree." 11

U.S.C. § 101(45). The key issue in resolving Rubin's motion to dismiss turns on the meaning of the phrase "consanguinity within the third degree as determined by the common law," as that phrase is used in § 101(45). However, before diving into the meaning of this phrase, it is helpful to understand the context in which this issue arises.

Section 547(b) of the Bankruptcy Code permits a trustee to avoid a preferential transfer of property made by a debtor before a bankruptcy petition is filed. There are a number of specific elements that must be shown to recover a preferential transfer. One of the elements is that the preferential transfer must have been made within 90 days before the date of the filing of the bankruptcy petition. 11 U.S.C. § 547(b)(4)(A). However, where the preferential transfer in question was made to an insider, then the look back period to recover the preferential transfer is extended from 90 days up to one year before the date of filing the bankruptcy petition under § 547(b)(4)(B) of the Bankruptcy Code. The term insider is not defined in the Bankruptcy Code. Instead, § 101(31) contains a non-exclusive list of entities each of which the Bankruptcy Code deems to be an insider. The non-exclusive list under § 101(31) varies, depending upon whether the debtor is an individual, a corporation, or other entity.

"According to the legislative history accompanying the statutory definition of insider, '[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'" Jahn v. Economy Car Leasing, Inc. (In re Henderson), 96 B.R. 820, 825 (Bankr. E.D. Tenn. 1989)

(quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 312, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6269).

> Because of his close relationship with the debtor, an insider typically knows more about the debtor's financial affairs than the debtor's other creditors, and is often in a position to influence or control, at least in part, the debtor's actions. An insider is usually the first to know that a debtor is contemplating bankruptcy. Armed with this information and power to control the debtor, the insider may step ahead of other creditors demanding payment and then influence the timing of the debtor's bankruptcy petition to avoid the ninety-day preference period. By extending the preference liability of insiders to one year, Congress made it more difficult for an insider to manipulate the timing of bankruptcy so as to avoid the effect of the preference section.

Id. (citation omitted).

By providing only a non-exclusive list of entities that are treated as insiders, § 101(31) permits a court to examine in each case the specific facts surrounding the relationships of other entities to a debtor to determine whether a particular relationship is one that calls for closer scrutiny than an arm's-length relationship. But, by providing that "the term 'insider' includes" a non-exclusive list of relationships with a debtor, Congress has essentially created an irrebuttable presumption that any entity having the attributes of one of the relationships in this non-exclusive list *always* makes such entity an insider of a debtor. In the case of an individual debtor, § 101(31)(A)(i) provides that a "relative of the debtor" is always an insider of that debtor. Similarly, where the debtor is a corporation, § 101(31)(B)(vi) provides that a "relative of a general partner, director, officer, or person in control of the debtor" is always an insider of that debtor. The inclusion of such persons in the non-exclusive list of § 101(31) represents a legislative determination that such persons

-5-

are, by virtue of such status alone, always in a position to influence or control, at least in part, the debtor's conduct. The issue then in cases involving a relative is not whether a relative is in such position to influence and control the debtor's conduct. Congress has already made that determination. Rather, the issue in such cases, and in this case, is deciding *who* is a relative and, therefore, an insider of a particular debtor under § 101(31) of the Bankruptcy Code.

Unlike § 101(31) of the Bankruptcy Code, which does not contain a definition of an insider, but contains only a non-exclusive list of entities that are statutorily deemed to be an insider, as noted § 101(45) of the Bankruptcy Code defines the term relative as meaning an "individual related by affinity or consanguinity within the third degree as determined by the common law . . . ." Although the Bankruptcy Code provides a definition of the term relative, the application of that definition ultimately turns on what is meant by the phrase "common law," as it is used in § 101(45) of the Bankruptcy Code. The Bankruptcy Code uses the phrase common law in other sections,[1] but does not define the phrase common law either in those sections or in any other section of the Bankruptcy Code. Neither the Trustee nor Rubin have cited any controlling authority regarding the phrase common law, as used in § 101(45) of the Bankruptcy Code. The meaning of the phrase is important in this case because the Trustee argues that Rubin, as Simcha's second cousin, is within the third degree of

---

[1] See, e.g., § 523(a)(19)(A)(ii) (referring to "common law fraud"); § 546(d) (addressing a "common law right" of reclamation); § 555 (addressing contractual rights "arising under common law"); § 556 (same); § 559 (same); § 560 (same); and § 561(c) (same).

consanguinity, and is therefore Simcha's relative. On the other hand, Rubin argues that, as

Simcha's second cousin, he is only related to Simcha by consanguinity within the

sixth degree and, therefore, is not his relative. To resolve the dispute between them

regarding whether Rubin is related to Simcha by consanguinity within the third degree or

within the sixth degree, as determined by the common law, requires the Court to consider

what the phrase common law means under § 101(45) of the Bankruptcy Code, so that the

Court can determine where to look to determine the degree of consanguinity between Rubin

and Simcha.[2]

 Rubin's motion to dismiss does not cite to any case law or other authority to assist the

Court in determining what the phrase common law means, as used in § 101(45) of the

Bankruptcy Code. Instead, Rubin's motion attaches a copy of a consanguinity chart that

supports his assertion that, as Simcha's second cousin, he is related to Simcha within the

sixth degree of consanguinity. The chart does not help the Court because Rubin offers no

explanation as to why the Court should adopt that chart. In the Trustee's response to the

motion to dismiss, the Trustee argues that the phrase common law means the canon law

---

[2] Both counsel for the Trustee and counsel for Rubin, representing other parties, previously took contrary positions in the Debtor's bankruptcy case with respect to a dispute involving the election of a permanent trustee. In that matter, the Trustee's counsel had argued that a second cousin was not a relative and Rubin's counsel had argued that a second cousin was a relative. At the hearing in this adversary proceeding held on July 1, 2011, both counsel made a point of noting the inconsistency between the other's earlier argument and their position in this adversary proceeding, without outright saying that the Trustee or Rubin should be bound by their respective counsel's earlier position. Because the Court never reached the issue of whether a second cousin is a relative in that prior dispute, the doctrine of judicial estoppel does not apply and counsel for both of the parties are free to change their positions in this adversary proceeding.

method of determining degrees of consanguinity. In support of this argument, the Trustee cites three separate bankruptcy case decisions, none of which are controlling, but all of which the Trustee asserts are supportive of the Trustee's request that the Court construe common law to mean canon law. Rubin's reply to this response attempts to distinguish those three cases, and argues that the Court should not follow them. However, although Rubin rejects those three cases and their reasoning, Rubin does not offer an alternative argument as to what the phrase common law means as it is used in § 101(45) of the Bankruptcy Code. Apparently believing that Michigan common law is not helpful to him, Rubin's reply then makes a separate argument that whatever the phrase common law may mean, the Court should not apply Michigan common law to the case at bar, even though Simcha is a resident of Michigan, and the bankruptcy case is filed in Michigan. Rubin urges the Court to instead apply New Jersey law, because Rubin is a resident of New Jersey. Rubin cites no authority for the proposition that New Jersey common law, rather than Michigan common law, is applicable.

There are very few opinions addressing the meaning of the phrase common law, as it is used in § 101(45) of the Bankruptcy Code. As noted earlier, there are no controlling decisions, but there are other bankruptcy court decisions that have considered this issue. Although citing three bankruptcy court decisions, the Trustee relies primarily on O'Neal v. Arnold (In re Gray), 355 B.R. 777 (Bankr. W.D. Mo. 2006). Like the case at bar, Gray involved a dispute over whether an individual's relationship to a debtor made that individual

-8-

a relative of the debtor and, therefore, an insider for purposes of preferential transfer avoidance actions. In that case, the debtor was Braxton Gray. The preference defendant was Jim Arnold. There was no dispute that Gray and Arnold were cousins. The trustee sought to recover a preferential transfer allegedly made by Gray to Arnold more than 90 days but within one year before Gray's bankruptcy petition was filed. Like this case, the Gray case involved the issue of whether the relationship between Arnold and Gray made Arnold a relative of the debtor under § 101(45) of the Bankruptcy Code. 355 B.R. at 778-79.

The Gray court began by looking at Missouri common law. The court did not discuss why it looked to Missouri common law, but noted that under Missouri common law, there are two different methods of ascertaining degrees of consanguinity. One of those methods is known as the "canon law" method, and the other is known as the "civil law" method. Id. at 779. Quoting from an opinion of the Missouri Supreme Court, the bankruptcy court in Gray explained that under the canon law method, the number of generations is counted from the common ancestor down to the farthest of the two descendants whose degree of relationship is to be ascertained. In contrast, under the civil law method, the counting ascends by generations starting with either of the two descendants up to the common ancestor, and then the counting descends from the common ancestor back down to the other descendant who is alleged to be a relative. Id. (quoting Missouri v. Thomas, 174 S.W.2d 337, 340 (Mo. 1943). The Gray court then explained that under the canon law method, Arnold and Gray, as cousins, are related in the third degree, but under the civil law method, they are related in the

-9-

fifth degree. Therefore, if the court were to apply the canon law method, Arnold would be a relative of the debtor under the Bankruptcy Code definition. That would make him an insider. But if the court were to apply the civil law method, then Arnold would not be a relative of the debtor, and therefore would not be an insider. The trustee in the <u>Gray</u> case urged the court to adopt the canon law approach. Arnold urged the court to follow the civil law approach. <u>Id.</u> at 780.

The court in <u>Gray</u> noted that the civil law approach had been adopted in another decision by a bankruptcy court in Missouri, <u>Dewoskin v. Brady</u> (<u>In re Hydraulic Industrial Products</u>), 101 B.R. 107 (Bankr. E.D. Mo. 1989). In the <u>Hydraulic</u> case, like the <u>Gray</u> case, the court started by looking at Missouri common law. 101 B.R. at 108. The only explanation in <u>Hydraulic</u> about why the court chose to look at Missouri common law was the following: "It is not inconsistent with the scheme of the Bankruptcy Code to determine that 'common law' refers to the body of applicable state law in effect at the time of the action which is the subject of [the] proceeding." <u>Id.</u> Although the courts in <u>Hydraulic</u> and <u>Gray</u> each looked to Missouri common law, they came to different conclusions about what Missouri common law actually provides.

In <u>Hydraulic</u>, the court held that Missouri common law generally "is the law of the land unless it is abrogated by the Constitution or by statute." <u>Id.</u> (citations omitted). The court then referred to the Missouri Probate Code's general rules of descent, under which consanguinity is determined by using the civil law method. <u>Id.</u> at 109. Using that method,

-10-

which requires counting on an ascending basis from one individual to a common ancestor, and then counting down again to the other individual in question, the first cousins involved in the <u>Hydraulic</u> case were not held to be within the third degree of consanguinity. Therefore, they were not within the definition of a relative under the Bankruptcy Code. <u>Id.</u> In contrast, the <u>Gray</u> court disagreed with the <u>Hydraulic</u> court's conclusion that the civil law method had been adopted by Missouri common law, and instead concluded that Missouri common law continued to apply the canon law method in some circumstances, and the civil law in other circumstances. 355 B.R. at 781. The <u>Gray</u> court then held that "both approaches continue to be viable in Missouri." <u>Id.</u> After noting that both of these two conflicting approaches were still utilized for some purposes under Missouri common law, the <u>Gray</u> court then stated the question before it as "which of the two approaches better conforms with the purpose of § 547 [of the Bankruptcy Code], which is to equalize the distribution scheme among similarly situated creditors." <u>Id.</u>

The <u>Gray</u> court adopted the canon law method, rather than the civil law method that had been utilized by <u>Hydraulic</u>. <u>Id.</u> at 782. However, the reason that the <u>Gray</u> court adopted the canon law method was not because of any determination that this method is what was required by Missouri common law. Instead, the court adopted the canon law approach because the <u>Gray</u> court perceived the canon law method to be more expansive, and would result in more individuals being treated as a relative and, therefore, as an insider for purposes of preferential transfer recovery under § 547(b) of the Bankruptcy Code. In other words, the

<u>Gray</u> court recognized that under the canon law method, a first cousin is within the third degree of consanguinity, but under the civil law method is not within the third degree of consanguinity.  Focusing on the policy of the preference laws, and in an effort to expand recovery under those laws, <u>Gray</u> held as follows:

> In sum, the interpretation urged by Arnold here, applying the "third degree" language to the civil law, results in an overly narrow definition of "relative" for preference avoidance purposes.  Applying the canon law, as opposed to the civil law approach (which would place even first cousins outside of the definition of "insider") better conforms with § 547's purpose.

<u>Id.</u>

Reading the <u>Hydraulic</u> and <u>Gray</u> opinions together does support the notion that the phrase common law, as used in § 101(45) of the Bankruptcy Code, suggests resort to state common law.  However, neither of those opinions offer any analysis of why they looked in particular to Missouri common law.  In both opinions, the implication is that Missouri common law applied because the bankruptcy case before each court was filed in Missouri, although this was not actually mentioned.  Further, the <u>Gray</u> court's ultimate holding in that case was not predicated upon its analysis of what Missouri common law required, but rather was predicated upon its belief that for policy reasons the preference laws should be construed expansively.  To accomplish that purpose, the <u>Gray</u> court cast a wide net over who might be a relative and who, therefore, might be an insider of a debtor.

A second case cited by the Trustee is <u>In re Cloverleaf Farmer's Co-Operative</u>, 114 B.R. 1010 (Bankr. D.S.D. 1990).  Unlike <u>Hydraulic</u>, <u>Gray</u> and the case at bar, <u>Cloverleaf</u>

did not involve an action to recover a preferential transfer from someone alleged to be a relative and an insider of a debtor. Instead, the issue in Cloverleaf involved whether the debtor in that case was a family farmer eligible to file a Chapter 12 petition. 114 B.R. at 1012-13. This determination turned on whether the individuals that owned the debtor entity were relatives within the meaning of § 101(45) of the Bankruptcy Code. If the individuals were not relatives within the meaning of that statutory definition, then the debtor would not qualify as a family farmer eligible to file a Chapter 12 case. In discussing this issue, the Cloverleaf court looked first at the language in § 101(45) and, citing Hydraulic, noted that there is very little legislative history as to Congress's intent with respect to the phrase common law used in that section. Id. at 1013-14. The Cloverleaf court then embarked on an extensive discussion of the meaning of consanguinity and the two recognized methods under common law of determining consanguinity, one according to the "historic single count" canon law method, and the other according to the civil law method. The Cloverleaf court then noted that South Dakota, the state in which the debtor's bankruptcy case was filed, "by statute . . . follows the civil law method of counting degrees, both ascending and descending." Id. at 1014. But then the court, based on Hydraulic, observed that "[t]wo sets of common law arguably exist," and "the Bankruptcy Code provides no express guidance as to which method to use." Id.

Similar to the path taken by the Gray court, the Cloverleaf court did not attempt to resolve what precedent under South Dakota common law dictated what common law

-13-

ultimately required that bankruptcy court to apply as the proper method of determining

consanguinity under § 101(45) of the Bankruptcy Code. Instead, the <u>Cloverleaf</u> court simply

picked one of the two recognized methods of counting consanguinity degrees. Like <u>Gray</u>,

<u>Cloverleaf</u> adopted the single counting method, known as the canon law method, that

requires counting the degrees of consanguinity on a descending basis from a common

ancestor down to the individual in question. <u>Id.</u> at 1015. The <u>Cloverleaf</u> court went on to

explain that its decision to adopt the canon law method of counting consanguinity degrees

would provide a "uniform law nationwide, and promote[ ] Congress' policy of limiting

Chapter 12 to family [farm] operations." <u>Id.</u> Ultimately, the <u>Cloverleaf</u> court held that under

the canon law method, the individuals in question were relatives, and, therefore, the debtor

did qualify as a family farmer. <u>Id.</u> at 1015-16.

Although not cited by either the Trustee or Rubin, at least one other bankruptcy court

has also considered the issue before the Court. In <u>Stevenson v. Sensing</u> (<u>In re Herbison</u>),

No. 96-28148-K, 1998 WL 35324197 (Bankr. W.D. Tenn. March 24, 1998), the issue

involved whether a recipient of an alleged preferential transfer was a relative of the debtor

and, therefore, an insider for purposes of determining the look back period under § 547(b) of

the Bankruptcy Code. The court in that case looked to Tennessee common law to supply the

answer to how consanguinity degrees should be counted under § 101(45) of the Bankruptcy

Code in that case. <u>Id.</u> at *3. After examining Tennessee common law, the court concluded

that the proper method of counting degrees of consanguinity under Tennessee law is to count

-14-

on an ascending basis from the debtor up to a common ancestor with the individual who received the alleged preferential transfer, and then count down from that common ancestor to such individual.  Id. at *4.  In other words, although not referring by name to the civil law method, the court in Herbison used the civil law method rather than what is commonly referred to as the canon law method that was adopted in Gray and Cloverleaf.  Like each of the other cited cases, the Herbison court applied the common law of the state in which the bankruptcy case was pending without extensive discussion of why it looked to that particular state's common law to determine how to count degrees of consanguinity.  But see In re Covey, 57 B.R. 665, 666 (Bankr. D.S.D. 1986) (addressing whether the debtors' prospective counsel was a relative, and relying not on state law, but instead Am. Jur. 2d, in holding that "[d]egrees of kinship under the common law are computed by counting the number of generations from the nearest common ancestor").

    As the few cases to discuss this issue all note, there is no definition of common law under § 101(45) of the Bankruptcy Code, nor is that phrase defined elsewhere in the Bankruptcy Code.  As those courts also uniformly note, there is no legislative history to § 101(45) to help inform the Court about the meaning of the phrase common law, as used in that section of the Bankruptcy Code.  Further, although the several bankruptcy courts that have looked at this issue have come to somewhat conflicting results, it is clear that most of the bankruptcy courts that have considered this issue have applied the common law of the state in which the bankruptcy case was pending, albeit without much explanation.

To determine how to count degrees of consanguinity in this case, and to accept either Rubin's contention that the Court should adopt what is known as the civil law method of counting, or to accept the Trustee's contention that the Court should adopt what is known as the canon law method, the Court must first determine what is the source of the law that the Court should examine to apply common law, as that phrase is used in § 101(45) of the Bankruptcy Code. Absent statutory definitions, legislative history, and controlling case law, it is appropriate to consider other definitions of that phrase. Black's Law Dictionary defines common law as follows:

> In general, it is a body of law that develops and derives through judicial decisions, as distinguished from legislative enactment. The "common law" is all the statutory and case law background of England and the American colonies before the American Revolution. . . .
>
> As distinguished from ecclesiastical law, it is the system of jurisprudence administered by the purely secular tribunals.

Black's Law Dictionary, 276 (West 6th ed. 1990) (citation omitted).

This definition is helpful, to the extent that it directs the Court to consider the body of law developed by judicial decisions, rather than by legislation. But it still does not tell the Court whose common law is applicable. In other words, where should the Court find the common law to determine the proper method of counting degrees of consanguinity in this case? Both the Hydraulic and Cloverleaf opinions note that under Erie R. Co. v. Thompkins, 304 U.S. 64, 78 (1938), state common law is to be applied in the absence of federal common law. The Court agrees with that statement. The Court also agrees with the decisions in Gray,

-16-

Cloverleaf, Hydraulic, and Herbison that the common law referred to § 101(45) of the Bankruptcy Code is supplied by state common law. Relying on Gray and Cloverleaf, the Trustee argues that the Court should adopt canon law as the proper method for determining consanguinity. But the Trustee does not argue that canon law is required by the common law in Michigan. Instead the Trustee seems to imply that the several bankruptcy court decisions cited by the Trustee provide some sort of federal common law method to determine consanguinity. The Court disagrees with that analysis. Relying upon the definition of common law stated above, and recognizing that there is no federal common law, the Court holds that it is state common law that supplies the common law in § 101(45) of the Bankruptcy Code. The Court is not persuaded that there is any basis to accept the Trustee's implicit argument that there is some sort of federal common law that can be traced to canon law.

Having decided that state common law is the source to examine when consulting common law under § 101(45) of the Bankruptcy Code, the Court still must decide which state supplies the relevant common law in this case. As noted earlier, Rubin argues that New Jersey common law should be applicable in this case because Rubin resides in New Jersey. But Rubin offers no authority for the Court to apply the law of the state of his residence rather than Michigan law. The Trustee steers altogether clear of the issue of which state supplies the common law, relying instead on those bankruptcy court opinions that used the canon law method, which is the more favorable method for the Trustee. In this case, the

-17-

Debtor is a Michigan corporation, and Simcha, its president, is a Michigan resident. The fact that Rubin, the alleged preferential transfer recipient, happens to reside in New Jersey does not convince the Court that New Jersey common law applies. Further, the Court notes that regardless of the reasoning or explanation provided, each of the cases cited by the Trustee ultimately applied the common law of the state in which the bankruptcy case was filed. None of them applied state common law of any state other than the state in which the bankruptcy case was filed. The Court rejects Rubin's unsupported assertion that New Jersey supplies the common law to be followed in this case and instead concludes that it must look to Michigan common law.

The only remaining issue is what does Michigan common law provide. Under Michigan law,

> the method of computing consanguinity by the civil law is to begin at either of the persons claiming relationship, and *count up* to the common ancestor, *and then downwards*, to the other person, in the lineal course, calling it a degree for each person, both ascending and descending, and the degrees they stand from each other is the degree in which they are related.

Van Cleve v. Van Fossen, 41 N.W. 258, 259 (Mich. 1889).[3]

_____

[3] There are many instances of Michigan statutory law addressing consanguinity. See, e.g., Mich. Comp. Laws Ann. § 168.561 (addressing relatives of candidates for public office); Mich. Comp. Laws Ann. § 600.838 (addressing the disqualification of judges); Mich. Comp. Laws Ann. § 768.10 (addressing the disqualification of jurors). The Court does not consider these statutes relevant because § 101(45) of the Bankruptcy Code directs that the Court look to common law, in contrast to other Bankruptcy Code sections that direct the Court in other contexts to look to "State or local law," § 522(b)(3), or "applicable nonbankruptcy law," §§ 524(c) and 541(c)(2). These other references may, in their particular context, require the Court to more broadly examine both the statutory and common law of a particular state for the purposes of those particular Bankruptcy Code sections, but § 101(45) directs the Court to

-18-

The one published case from a Michigan court addressing the application of the canon law method to determine degrees of consanguinity rejected its use when applied to a statute for the disqualification of judges.  In <u>Boyer v. Backus</u>, 280 N.W. 756 (Mich. 1938), the Michigan Supreme Court addressed the disqualification of a judge.  The statute at issue set forth the degree of consanguinity required for disqualification, but not the method for counting those degrees.  The court stated the issue as follows: "[A] controversy has arisen between plaintiff, who claims that in determining the degree of consanguinity the canon law should be followed, and the defendants, who assert that the rule of civil law prevails in this jurisdiction." <u>Id.</u> at 757.  For guidance, the court looked to the law on descent and distribution, the field of law in which the degree of consanguinity is most commonly at issue. In Michigan, "the legislature has definitely announced the rule. . . . The degrees of kindred shall be computed according to the rules of the civil law." <u>Id.</u> (quotation marks and citation omitted).  The court then applied that legislative ruling to the statute at issue, holding that "the rule of the civil law prevails." <u>Id.</u>

Under Michigan common law, the proper method to determine the degrees of consanguinity is the method commonly referred to as the civil law method.  Applying that method, counting up from Simcha to the common great-grandparent that Simcha shares with Rubin, is three levels, and counting down to Rubin from that common great-grandparent is another three levels.  That represents six degrees of consanguinity.  With six degrees of

---

examine only the common law, and makes no reference to nonbankruptcy statutory law.

consanguinity, Rubin is not a relative of Simcha within the meaning of § 101(45) of the Bankruptcy Code. See In re Estate of Jurek, 428 N.W.2d 774, 775 (Mich. Ct. App. 1988) ("Petitioners are decedent's second cousins, being descended from decedent's great-grandparents, and, therefore, were related to the decedent in the sixth degree of kinship.").

## Conclusion

Section 101(45) of the Bankruptcy Code directs the Court to determine whether an individual is a relative based upon consanguinity within the third degree as determined by the common law. The Court concludes that in this case, that statutory provision requires the Court to look to Michigan common law to determine the proper method of counting degrees of consanguinity because the Debtor is a Michigan corporation in a bankruptcy case filed in Michigan, because Simcha is a resident of Michigan, and Simcha is the president of the Debtor. The Court rejects the notion that there is some other federal common law that is referenced in § 101(45) of the Bankruptcy Code, and also rejects the notion that an expansive view of the policies behind the preference laws somehow requires this Court to cast the widest net possible in counting degrees of consanguinity. Instead, the Court holds that the method of counting degrees of consanguinity for purposes of § 101(45) of the Bankruptcy Code is determined solely by the common law of the state of Michigan. The common law of the state of Michigan utilizes the method known as the civil law method. That method requires counting up each level from Simcha to Simcha's common great-grandparent with Rubin, and then counting down from that common great-grandparent to Rubin. Applying

-20-

that method in this case means that Rubin, although a second cousin of Simcha, is related to Simcha within the sixth degree of consanguinity. Because Rubin is not related to Simcha within the third degree of consanguinity, as counted pursuant to Michigan common law, Rubin is not a relative of Simcha under § 101(45) of the Bankruptcy Code. Therefore, Rubin's status as a second cousin of Simcha by itself does not make Rubin an insider of the Debtor under § 101(31)(B)(vi) of the Bankruptcy Code.

As noted earlier in the opinion, the definition of insider in § 101(31) of the Bankruptcy Code lists the specific entities, such as a relative, which are per se insiders. But use of the word "includes" in the definition means that "the categories are illustrative rather than exhaustive." Anstine v. Carl Zeiss Meditec AG (In re U.S. Medical, Inc.), 531 F.3d 1272, 1276 (10th Cir. 2008) (quotation marks and citation omitted). Other entities may be a "non-statutory" insider if they "have a sufficiently close relationship with the debtor that [their] conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." Id. (quotation marks and citation omitted). See also Pepper v. Litton, 308 U.S. 295 (1939) (denying the claim of an insider who "utilized his strategic position for his own preferment to the damage of" another creditor, finding the insider was "the dominant influence over" the debtor and "used his power not to deal fairly with creditors of that company but to manipulate its affairs in such a manner that when one of its creditors came to collect her just debt the bulk of the assets had disappeared into another [insider] company"); Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.), 269 F.3d 726, 744-45 (6th

Cir. 2001) (reviewing the equitable subordination of an insider claim with "rigorous[ ]

scrutin[y], and noting "courts impose a higher standard of conduct upon insiders" "not

because the insider relationship makes them inherently wrong, but because insiders usually

have greater opportunities for . . . inequitable conduct") (quotation marks and citation

omitted).

      The Trustee's complaint alleges that Rubin is Simcha's second cousin.  For the

reasons explained in this opinion, that status by itself does not make him an insider of the

Debtor.  The Trustee does not allege any other factual matter, such as a close relationship,

non-arm's length dealings, influence or inequitable conduct which, if accepted as true for

purposes of this motion to dismiss, states a claim that is plausible on its face that Rubin is an

insider of the Debtor.  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009); Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Therefore, Rubin is entitled to dismissal under

Fed. R. Civ. P. 12(b)(6), incorporated by Fed. R. Bankr. P. 7012, with respect to the $22,000

payment made more than 90 days before the filing of the petition for relief.   The Court will

enter a separate order consistent with this opinion granting Rubin's motion to dismiss that

portion of the complaint that seeks to recover the $22,000.00 payment.

.

```
Signed on August 24, 2011
                                      /s/ Phillip J. Shefferly
                                     Phillip J. Shefferly
                                     United States Bankruptcy Judge
```

-23-